IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARCHELE ANDREWS, | ) |
| | ) No. 2:19-cv-1631-RJC |
| Plaintiff, | ) |
| | ) |
| vs. | ) Judge Robert J. Colville |
| | ) |
| PNC NATIONAL BANK, N.A., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge.

Plaintiff Marchele Andrews alleges that her former employer terminated her because of her race. She asserts claims for retaliation and discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3. Defendant PNC Bank, N.A.[1] filed a Motion for Summary Judgment (ECF No. 33) on all of Andrews' claims. As discussed more fully below, PNC's motion will be granted-in-part and denied-in-part.

**I.    BACKGROUND**

**A.    Factual Background[2]**

PNC hired Andrews, who is African American, as a Customer Service Representative ("CSR") IV in April 2010. Defs.' Concise Statement of Facts Not in Dispute ¶¶ 1–2. (ECF No. 34) ("Defs.' SOMF"). Andrews reported to Client Solutions Manager Pam Bandi, who reported to Senior Client Manager Jane McLaughlin. *Id.* ¶ 3. Andrews was also directly supervised by

---

[1] PNC contends that it is incorrectly named in the caption. For purposes of this opinion, this Court refers to the Defendant simply as PNC.

[2] Facts discussed in this section are not in dispute unless otherwise noted.

Becky Burke, who was not a manager and could not hire, fire, promote, or discipline employees. *Id.* ¶ 4.  However, Burke provided feedback and input to Bandi on the performance of CSRs and sat in on monthly meetings that Bandi held with CSRs, including Andrews.  *Id.* ¶¶ 5, 48.

In 2011, PNC combined two existing departments to create the Treasury Management Client Care department.  *Id.* ¶ 21.  Andrews was assigned to the Client Services Group within the TMCC shortly after its creation.  *Id.* ¶ 22.  As a CSR within the TMCC, Andrews was generally responsible for responding to customer service requests by phone, e-mail, and chat.  *Id.* ¶ 23. Requests for assistance could come from internal customers (i.e., from other branches within PNC) or external customers.  *Id.* ¶ 23.  CSR IVs like Andrews were expected to respond to more complex inquiries, to have advanced knowledge of PNC's products and systems, to navigate multiple computer systems and applications, and to handle unresolved calls escalated from less experienced CSRs.  *Id.* ¶ 24.

PNC was initially satisfied with Andrews' performance.  *Id.* ¶ 29.  Bandi gave Andrews ratings of "Achieves" and "Meets All Expectations" in her 2010 and 2011 performance reviews, respectively.  *Id.* ¶¶ 29–30.  In her 2010 performance review, Bandi commended Andrews' performance but recommended as areas for improvement that Andrews should "become more aware of voice tone on customer calls" and "continually ask for assistance."  *Id.* ¶ 29.

At some point in 2012, Bandi asserts that she began receiving complaints about Andrews from internal and external PNC customers, many expressing that Andrews was rude and disrespectful on the phone.  *Id.* ¶ 31.  For her part, Andrews denies that she was rude and disrespectful to customers on the phone and cites her own deposition testimony denying that she could not recall specific complaints.  Pl.'s Response to Def.'s Concise Statement of Facts Not in Dispute ¶ 31 (ECF No. 39) ("Pl.'s SOMF"); Def.'s App'x, in Supp. of its Mot. for Summ. J., Ex.

B at 204:8–205:6 (ECF No. 36) ("Def.'s App'x"). Burke also reported to Bandi that Andrews was disrespectful to Burke and was not taking direction, instruction, or feedback about daily tasks. Def.'s SOMF ¶ 32. Andrews denies ever refusing to take direction from Burke. Pl.'s SOMF ¶ 32.

When Bandi met with Andrews to discuss her concerns about Andrews' performance, Andrews' told Bandi that Burke was treating her differently than others in the department because she is African American. Def.'s SOMF ¶ 33. Bandi escalated Andrews' complaint to her supervisor, McLaughlin, who reported it to PNC's Employee Relations department for investigation. *Id.* ¶ 34. Senior Employee Relations Investigator Jodie Fine-Sheriff investigated the complaint. *Id.* ¶ 35.

Fine-Sheriff interviewed Andrews, who reported that Burke was biased against her, had trouble communicating with African American employees generally, did not invite Andrews or other African American employees to a group bowling event, talked down to her, and held her to a higher standard than her co-workers. *Id.* ¶ 36. Fine-Sheriff noted that both Andrews and Burke were being coached by Bandi about the need for professionalism in their interactions. *Id.* ¶ 37. She also noted that all employees in the group received an invitation to the group bowling event via email. *Id.* Ultimately, she concluded that Andrews' complaint was unfounded. *Id.*

Andrews received her first verbal warning in December 2012 for being argumentative on the phone with customers (although she denies that she was ever rude or disrespectful). *Id.* ¶ 39; Pls.' SOMF ¶ 39. Nevertheless, Bandi gave Andrews an overall performance rating of "Meets All Expectations" for 2012, noting that Andrews' demonstrated some "improvement with maintaining a positive attitude with internal and external clients." Def.'s SOMF ¶ 40.

In March 2013, Andrews received a leadership evaluation from Bandi identifying areas for improvement.  *Id.* ¶ 51.  According to the evaluation, Andrews: "needed to maintain a positive attitude on all client calls; demonstrate a better understanding of customers' needs 'while putting a smile in [her] voice'; take ownership of her calls . . . rather than referring them to other departments; improve her overall product and procedure knowledge; improve her time management and timely document her calls; and demonstrate leadership by gaining the confidence of her co-workers so that they would look to her for assistance."  *Id.*  Andrews denied that she needed to improve in these areas.  *Id.* ¶ 52.

Bandi gave Andrews a second and third verbal warning in May of 2013 (one for reported incidents of being argumentative with customers on the phone and another for failing to timely document her calls).  *Id.* ¶¶ 53, 55.  Andrews called PNC Employee Relations to voice her disagreement with the verbal warnings and to complain that Bandi was upset with her for that disagreement.  *Id.* ¶ 56.  Andrews was advised to discuss the issue with Bandi.  *Id.*

In November 2013, Bandi gave Andrews her fourth verbal warning for failing to meet goals about the time amount of time she was required to be logged in and taking calls each day.  *Id.* ¶ 57.  Although PNC had put a process in place allowing CSRs to submit justifications when they could not meet the required time goals on a particular day, Andrews had not been submitting justifications.  *Id.*

In January 2014, Andrews received an overall performance rating of "Meets Some Expectations" (the second lowest of five ratings) for the year 2013.  *Id.* ¶ 58.  Bandi's feedback focused on Andrews need to improve her timeliness in resolving issues and her attitude when dealing with customers.  *Id.* ¶ 60.  In her deposition, Andrews disagreed with the substance of the performance rating and criticized Bandi for her inability to clearly explain her feedback.  Pl.'s

4

SOMF ¶ 61. Andrews received a fifth verbal warning in January 2014 for failing to meet goals related to the time she was required to be logged each day. *Id.* ¶ 62.

Andrews received her first written warning from Bandi in March of 2014. *Id.* ¶ 63. The warning cited her "continued failure to meter her phone goals or provide timely justifications of shortages . . . ." *Id.* Andrews refused to sign the warning and called Employee Relations to again complain that she was being held to a higher standard because of her race. *Id.* ¶¶ 63–64. Fine-Sheriff investigated and again found Andrews' complaints unfounded. *Id.* ¶ 65. Andrews escalated the matter to PNC's Corporate Ombudsman, who referred it in turn to a different investigator in the Employee Relations department, Employee Relations Investigations Manager Joshua Crocker. *Id.* ¶ 66. Crocker reviewed and confirmed Fine-Sheriff's findings. *Id.*

Despite some improvements, Bandi attests that Andrews' continued to receive negative customer feedback and, in November 2014, Bandi gave her a sixth verbal warning. *Id.* ¶ 67. Around the same time, Bandi offered to transition her to a different position where she would only need to respond to email and chat inquiries. *Id.* ¶ 68. Andrews agreed to that move. *Id.* ¶ 69.

Bandi gave Andrews an overall performance rating of "Meets Some Expectations" for 2014, based primarily on the customer service concerns that Bandi had addressed with her. *Id.* ¶¶ 70–71. In the overall summary portion of Andrews' 2014 review, Bandi described Andrews as "a dependable employee with a good work ethic" but noted that she needed to improve her customer service. *Id.* ¶ 71. Andrews complained about her 2014 performance evaluation to the Employee Relations department, which assigned Senior Employee Relations Specialist Debra Kindred to conduct the investigation. *Id.* ¶ 74. Kindred noted that Andrews' complaints of being "treated differently" had been previously reported and declined to revisit them, advising her

instead that her performance rating appeared to be appropriate based on Kindred's review.  *Id.* ¶ 75.

Despite Andrews' move to a new department, Bandi attests that Andrews continued to perform poorly, leading to a seventh verbal warning on May 7, 2015.  *Id.* ¶ 77.  Bandi offered Andrews regular coaching and feedback but did not see improvement from Andrews.  *Id.*  ¶ 78.

In September 2015, Bandi gave Andrews a second written warning.  *Id.*  The warning requires "immediate and sustained improvement" in several performance areas, including timely resolution of client issues, the reassignment of Andrews' work to coworkers due to her inefficiency, timely response to client email, and demonstration of product knowledge.  *Id.* ¶ 79–80.  Andrews testified in her deposition that she did not need to improve in the identified areas and that she was not being given credit for all of the work she was performing.  *Id.* ¶ 81.

Bandi gave Andrews a performance rating of "Meets Some Expectations" for 2015.  *Id.* ¶ 85.  This followed several months of reassignment of Andrews' work to her colleagues, causing backlogs and other issues within the department.  *Id.* ¶ 82–84.  The 2015 performance evaluation noted that "Andrews did not meet the call resolution goal . . . in any month in 2015," resulting in a rating of "Does Not Meet Expectations" in that section of the evaluation.  *Id.* ¶ 86.

In February 2016, Bandi placed Andrews on probation.  *Id.* ¶ 87.  The probation provided Andrews with a 90-day period to demonstrate sustained improvement in several areas including productivity, product and process knowledge, and timely follow-up.  *Id.* ¶ 90.  Following the probation, Andrews called Employee Relations and complained that she was being retaliated against for her 2012 complaint against Burke, that she was being excluded from meetings and trainings, that she had not received a raise, and that other employees were allowed to gossip and surf the internet but that she was not.  *Id.* ¶ 91.  Her complaint was reviewed by Senior Employee

Relations Investigator Amy Laskody, who ultimately concluded that her complaint was unfounded. *Id.* ¶¶ 92–93.

In April 2016, Bandi entered into a discussion with Employee Relations regarding reported incidents that Andrews had improperly disclosed confidential information. *Id.* ¶ 96. That prompted an investigation into the incidents by Laskody. *Id.* ¶¶ 96–97. Simultaneously, Bandi began discussing Andrews' failure to demonstrate improvement with Kindred. *Id.* ¶ 98. Kindred recommended that termination would be appropriate and, after consulting with McLaughlin, Bandi agreed. *Id.* ¶ 99. Bandi, McLaughlin, and Kindred (via telephone) met with Andrews on May 17, 2016 and terminated her employment. *Id.* ¶ 100.

## B. Procedural Background

Andrews dual-filed charges with the Pittsburgh Commission on Human Relations and the U.S. Equal Employment Opportunity Commission on December 14, 2016. Def.'s SOMF ¶ 116. The EEOC issued Plaintiff a right to sue letter on September 18, 2019. Compl. ¶ 6 (ECF No. 1). She initiated this action on December 17, 2019. Compl. (ECF No. 1). In her complaint, she asserts a single count including claims for retaliation and discrimination in violation of Title VII. *Id.* PNC filed the pending motion on September 24, 2021. Mot. for Summ. J. (ECF No. 33). That motion is fully briefed and ripe for decision.

## II.    LEGAL STANDARD

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Under Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most

7

favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48. Only a dispute over a material fact—that is, a fact that would "affect the outcome of the suit under the governing substantive law"—will preclude the entry of summary judgment. *Id.* at 248.

## III. DISCUSSION

Andrews' complaint alleges two theories of relief: retaliation and discrimination, both in violation of Title VII. *See generally* Compl. (ECF No. 1). In her opposition, Andrews asserts that she has also alleged a claim for hostile work environment. Br. in Opp. to Mot. for Summ. J. at 1–2 (ECF No. 40) ("Br. in Opp."). The Court will address Andrews' newly asserted hostile work environment claim first, and then will move on to her retaliation and discrimination claims.

### A. Hostile Work Environment Claim

PNC argues that summary judgment in its favor is proper on Andrews' hostile work environment claim because she raised it for the first time in her brief opposing summary judgment. Def.'s Reply Br. in Further Supp. of Mot. for Summ. J. at 11–14 (ECF No. 45) ("Reply Br."). Andrews concedes that "[t]he Racially Hostile Work Atmosphere [claim] does not have a separate Count in the Complaint . . . ." Br. in Opp. at 1. Nonetheless, she cites four paragraphs from her

complaint which, she says, sufficiently allege a hostile work environment claim. Br, in Opp. at 2 (citing Compl. ¶¶ 24, 33, 36, 46). Andrews dedicates a substantial portion of her brief to a defense of this phantom claim; however, because she failed to properly raise it in her complaint, she cannot raise it for the first time now.

"[A] plaintiff may not expand [her] claims to assert new theories for the first time in response to a summary judgment motion." *Ward v. Noonan*, 147 F. Supp. 3d 262, 280 n.17 (M.D. Pa. 2015) (first alteration in original) (quoting *Desparois v. Perrysburg Exempted Village Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012)); *see also Speziale v. Bethlehem Area Sch. Dist.*, 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003) (declining to address substantive due process claim raised in response to summary judgment where plaintiff's third amended complaint alleged only violations of procedural due process). Throughout this litigation, Andrews has maintained that she asserts two theories of liability: discrimination and retaliation. *See* Compl. at 12 (identifying the sole count as "Violation of Title VII Based on Racial Discrimination and Retaliation"); Fed. R. Civ. P. 26(f) Report of the Parties at 1 (ECF No. 10) ("Plaintiff Marchele Andrews asserts claims for race discrimination and retaliation against her former employer, PNC Bank, N.A., under Title VII of the Civil Rights Act of 1964 (Title VII), arising out of the termination of Plaintiff's employment on May 17, 2016."); Joint Pre-Conference Statement at 2 (ECF No. 29) ("Plaintiff asserts claims for race discrimination and retaliation against PNC under Title VII of the Civil Rights Act of 1964, arising out of the termination of her employment on May 17, 2016."). She has neither raised a hostile work environment theory before her opposition to summary judgment nor sought to amend her complaint to add that claim. Accordingly, it is not properly before the Court and will not be considered.

### B. Retaliation Claim

PNC moved for summary judgment on Andrews' retaliation claim, arguing that she could not establish either a prima facie case of retaliation or pretext. Def.'s Br. in Supp. of Mot. for Summ. J. at 17–19 (ECF No. 35) ("Br. in Supp."). Andrews' opposition fails to even mention the word retaliation, much less substantively respond to PNC's motion. Recognizing Andrews' failure to address its arguments, PNC asks that judgment be entered in its favor on Andrews' retaliation claim. Reply Br. at 2. "[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues.'" *Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) (quoting *Skirpan v. Pinnacle Health Hosps.*, No. 1:07-cv-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)). In such circumstances, "waiver is 'a necessary corollary' to the principle that summary judgment is appropriate where the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Id.* (quoting *Skirpan*, 2010 WL 3632536, at *6). Here, waiver is appropriate because Andrews has failed to oppose summary judgment on her retaliation claim. Accordingly, judgment is proper on that claim.

### C. Discrimination Claim

Only Andrews' discrimination claim remains. PNC argues that Andrews has failed to establish a *prima facie* case of discrimination and that, in any event, PNC terminated Andrews because she failed to meet performance expectations despite several consecutive years of corrective action. Br. in Supp. at 4–13. Andrews argues that her supervisors subjected her to a higher standard than white employees in her position, ostracized her and other African American employees in the department, and forced her out of the position. Br. in Opp. at 6–7. The Court

concludes that a genuine dispute of material fact exists regarding the circumstances of Andrews' termination that precludes summary judgment.

Title VII provides a cause of action for race discrimination in employment. Under Title VII, "[i]t shall be an unlawful employment practice for an employer to . . . discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a). A plaintiff may prove race discrimination under Title VII "by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 [ ] (1989), or indirectly through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [ ] (1973)." *Knight v. Delaware Econ. Dev. Office*, 83 F. Supp. 3d 606, 613 (D. Del. 2015). Andrews has not proffered direct evidence of discrimination, so the *McDonnell Douglas* framework applies.

### 1. Prima Facie Case

At the first step of the *McDonnell Douglas* framework, "the plaintiff must establish a prima facie case of discrimination." *Reeves*, 530 U.S. at 142 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). To establish a prima facie case of employment discrimination under Title VII, "the plaintiff must show (1) [she] belongs to a protected class, (2) [she] was qualified for the position, (3) [she] was subjected to an adverse employment action, such as termination, and (4) the circumstances of the adverse action 'give rise to an inference of unlawful discrimination'" *Mitchell v. City of Pittsburgh*, 995 F. Supp. 2d 420, 430 (W.D. Pa. 2014) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

The parties dispute only whether Andrews has established the fourth element of her prima facie case. The fourth element of the prima facie case calls for "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *O'Connor v. Cons. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (cleaned up). A plaintiff can satisfy this burden by showing that she was replaced by someone outside of the protected class, or

that someone outside of her protected class was treated more favorably; however, neither type of evidence is necessary if the plaintiff offers other evidence establishing an inference of discrimination. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 355 (3d Cir. 1999) (holding that "it is inconsistent with Title VII to require a plaintiff to prove that she was replaced by someone outside her class in order to make out a prima facie case"); *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997) (holding that plaintiff was not required to show employees outside of the protected class "were treated more favorably than he was") *abrogated on other grounds by Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999).

Here, PNC argues that Andrews cannot show that she was replaced by someone outside her protected class or that comparable employees outside her protected class were treated more favorably. Br. in Supp. at 6–7. Indeed, PNC points out that only one other CSR was terminated from the TMCC department by Bandi: a white woman. Def.'s SOMF ¶ 108. Nonetheless, Andrews asserts that she has in fact identified a comparable employee outside her protected class—her supervisor, Becky Burke—who was treated more favorably. Br. in Opp. at 6. She submits the affidavit of Yolanda Bell, who asserts that she observed Burke come to work intoxicated. Affidavit of Yolanda Bell ¶ 4 (ECF No. 41) ("Bell Aff."). [3] Andrews argues that Burke should have been

---

[3] PNC contests the admissibility of the affidavits of Yolanda Bell and Joan Stewart, arguing that they are inconsistent with Local Civil Rule 56(C)(1)(c) (because Andrews failed to assert the facts contained in the affidavits in a separate statement of material facts) and with Federal Rule of Civil Procedure 56(c)(4) (because they contain hearsay statements, legal conclusions, and other assertions not based on personal knowledge). Reply Br. at 7–11. While the Court understands PNC's objection, PNC has ably responded to the facts asserted in the affidavits in its reply materials. The Court perceives no prejudice to PNC in considering the affidavits to the extent that they contain admissible evidence. The Court will not strike or otherwise wholly disregard the affidavits but will instead disregard specific paragraphs that it deems not properly supported by personal knowledge. *Cf. Ruple Builders, Inc. v. Brackenridge Constr. Co.*, No. , 2019 WL 112262, at *2 (W.D. Pa. Jan. 4, 2019) (denying motion to strike but separately considering and disregarding improper paragraphs of challenged declaration).

fired because of this "incredibly outrageous" behavior; that Burke was not fired, while Andrews was fired "for much less problematic behavior, shows that Andrews was treated less favorably. Br. in Opp. at 6.

Andrews' argument that PNC's failure to fire Burke for intoxication at work fails because Burke is not a similarly situated employee. "A similarly situated employee does not need to be identically situated, but the comparator must be similar to plaintiff in 'all relevant respects.'" *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014) (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011)); *see also Durst v. City of Phila.*, 798 F. App'x 710, 713 (3d Cir. 2020) ("Although 'similarly situated' does not mean identically situated, the comparator must be similar in all relevant respects." (citation omitted)). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher*, 441 F. App'x at 882 (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–61 (5th Cir. 2009)). In *Wilcher v. Postmaster General*, the Third Circuit held that a proffered comparator was not similarly situated to the plaintiff, despite having engaged in the same conduct as the plaintiff, because "she held a superior position . . . ." *Id.* Similarly, in *Durst v. City of Philadelphia*, the Third Circuit held that a city code inspector had not proffered a similarly situated comparator because the comparator's misconduct (inspecting homes with

---

Only two paragraphs in the affidavits appear to contain inadmissible material. Paragraph 5 of Stewart's affidavit appears to contain inadmissible hearsay statements. *See* Aff. of Joan Stewart ¶ 5 (ECF No. 42) ("Stewart Aff.") (discussing stories confided in Stewart by other African American employees at PNC). The Court will not consider those statements. Paragraph 4 of Bell's affidavit contains the assertion that "a hostile work environment for African American female employees" existed in the TMCC department. Bell Aff. ¶ 4. The Court will not consider that assertion, but will consider the remainder of the paragraph to the extent that it describes the circumstances that Bell herself observed while she was employed in the TMCC.

children present while being a registered sex-offender) was not like the plaintiff's misconduct (beginning field work without proper permission in violation of city rules). 798 F. App'x at 713.

Here, Burke was not similarly situated to Andrews for at least three reasons: First, Burke was Andrews' direct supervisor and had different job responsibilities. Second, Burke's alleged misconduct (intoxication at work) is not like PNC's asserted reason for Andrews' dismissal (failure to meet employer standards). Finally, while Bell swears that Burke showed up to work smelling of alcohol, Aff. of Yolanda Bell ¶ 4 (ECF No. 41), Andrews does not present any evidence that others at PNC knew of Burke's alleged intoxication or that it was ever reported. Even assuming that Burke could be a proper comparator, a factfinder could not draw an inference that PNC treated Burke more favorably than Andrews without evidence that any decisionmaker at PNC knew about Burke's misconduct.

If that were all the evidence Andrews could muster, then summary judgment in PNC's favor would be appropriate. However, Andrews also argues that discrimination that she faced from her supervisors in the department establishes an inference of unlawful discrimination.[4] First, Andrews points to several incidents which she argues, taken together, permit an inference of discriminatory animus. In response to deposition questions about whether anyone at PNC used a racial slur against her, Andrews testified that she and her African American colleagues were subjected to demeaning comments, micromanaged, and held to a different standard:

> Jane [McLaughlin] asked me if my hair was my own. She was astonished at how knowledgeable I was regarding my job. The situation between me and Dana where we weren't allowed to speak with one another. Other situations . . . when I was speaking with . . . the other few black individuals that worked in the department how

---

[4] Andrews primarily makes these arguments in support of her hostile work environment claim; however, as discussed *supra* Section III(A), that claim is not properly before the Court. Andrews effectively incorporates those same arguments into the section of her brief respecting her discrimination claim, and the Court considers them in that context. *See* Br. in Opp. at 6.

> we were constantly being followed and interrupted and . . . you know, we were held to—or I was held to—a different standard . . .
> I was demeaned. I was insulted. I was told nobody likes me, nobody wants to talk to me, nobody wants to sit by me. I sneeze too loud. I breathe too much.
> There was always something constantly. If my hair was mine. There was an email sent to Jane, was I one of hers. I'm nobody's propery.
> So did they call me the N-word? No.

Def.'s App'x, Ex. B at 74:24–75:24.

Andrews also testified that Burke personally invited every white employee in the department to a department bowling event but did not invite a single African American employee.

> Was I excluded—was I excluded from the bowling event? Yes. Did I watch Becky go around to every white individual in that department and ask them to participate? Yes. Did I watch her not ask one black individual? Yes.

*Id.* at 76:7–16. This slight stuck out to Andrews because she is a "great bowler." *Id.* at 77:7–10.

Andrews also asserts that

Further, Andrews testified that Bandi had trouble communicating professionally with African American employees and would often make jokes or references to movies that exploit stereotypes about African Americans:

> Well, it was commonplace for Pam [Bandi] to have conversations regarding, you know, the buffoonish type of stereotypical television characters and things like that . . . . That's when she was allowed to be free with her, you know, bias against black individuals.

*Id.* at 77:15–20. Andrews further explained that Pam would not discuss advancement opportunities with African American employees but that "she'd laugh and joke with you all day . . . if it was pertaining to some form of exploitation." *Id.* at 78:8–14.

Andrews' claims of differential treatment of African American employees are backed up by the affidavits of Yolanda Bell and Joan Stewart. Bell—who is African American and was

15

employed in the TMCC department at PNC until October 2014—recalls that Burke scolded her for a minor mistake in front of her colleagues. Bell Aff. ¶ 5. Bell never observed Burke publicly scold a white employee. *Id.* Bell also observed that African American women in the TMCC were "watched and monitored" and were "called into the office for miscellaneous petty things," circumstances to which white employees were not subjected. *Id.* ¶ 4.

Stewart—who is also African American and retired from the TMCC department at PNC as a supervisor in 2018—observed that white managers would prohibit African American employees from engaging in conversation with one another during the workday. Stewart Aff. ¶ 6 (ECF No. 42). According to Stewart, white employees were not so restricted. *Id.* Stewart also observed white managers give white employees only a warning for taking excessive breaks while African American employees were subject to more severe discipline for the same conduct. *Id.*

PNC asserts that the comments from McLaughlin and Bandi amount to no more than "stray remarks, lacking any temporal or causal connection to Andrews' termination." Reply Br. at 4 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1993)). The Third Circuit has "generally held that comments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) (citing *Gomez v. Allegheny Health Serv. Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995); *Ezold*, 983 F.2d at 546). Here, however, the comments were not made by "individuals outside of the decisionmaking chain." *Id.* McLaughlin and Bandi each had a direct role in the decision to terminate Andrews. Their comments are relevant to their attitudes, and their attitudes are relevant to their approach to Andrews' employment and termination.

Moreover, even if the comments were properly characterized as stray remarks by nondecisionmakers, "[s]uch evidence 'may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Id.* (quoting *Antol v. Perry*, 82 F.3d 1291, 1302 (3d Cir. 1996)). "Accordingly, stray remarks by nondecisionmakers may be properly used by litigants as circumstantial evidence of discrimination." *Id.* (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995)). While stray remarks may be insufficient standing alone, here there is corroborating evidence from two witnesses—Yolanda Bell and Joan Stewart—who attest that African American employees in the TMCC department at PNC were disadvantaged. Their experiences are consistent with Andrews' own reports of mistreatment by her supervisors. PNC asserts that the assertions in their affidavits should be disregarded because they are vague, speculative, and conclusory; but, a review of the affidavits reveals that Bell and Stewart relayed their experience with and observation of discrimination at PNC.

A reasonable jury could conclude, based on the evidence discussed above, that PNC based its decision to terminate Andrews "on an illegal discriminatory criterion." *O'Connor*, 517 U.S. 308, 312 (1996) (cleaned up). Accordingly, Andrews has presented sufficient evidence of a prima facie case of discrimination.

### 2.     *Legitimate Nondiscriminatory Reason*

After a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant "to 'produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 254). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Id.* at 142 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509). Here, PNC has produced ample evidence that it terminated Andrews after several years of performance issues,

written and verbal warnings, and coaching by her supervisors. Andrews' failure to meet performance expectations is a legitimate, nondiscriminatory reason for her termination.

### 3. *Pretext*

If the defendant offers a legitimate nondiscriminatory reason, then "the plaintiff may attempt to establish that [she] was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 143 (quoting *Burdine*, 450 U.S. at 255 n.10). To make this showing of pretext, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "[T]he plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case" if that evidence is sufficient "to discredit the defendant's proffered reasons." *Id.* The trial court may not make credibility determinations or weigh the evidence of pretext against the asserted nondiscriminatory reason. *See Burton v. Teleflex, Inc.*, 707 F.3d 417, 428–30 (3d Cir. 2013) (vacating summary judgment where the trial court "improperly made credibility determinations") (citing *Doe v. Luzerne Cty.*, 660 F.3d 169, 175 (3d Cir. 2011)). If a reasonable factfinder *could* find for plaintiff on the issue of pretext, then summary judgment is not appropriate.

Here, a reasonable juror could find, based on Andrews' prima facie case, that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. PNC asserts that it terminated Andrews because she failed to meet performance expectations. It submits affidavits from Andrews' supervisors, among others, who attest that she received counseling for her deficient performance but did not improve. For her part, Andrews testified in her deposition that she was treated differently than her white

18

colleagues and that she was subjected to a higher standard. She notes specific comments and experiences that singled her out because of her race. And she submits affidavits of two former employees in the TMCC department—both members of the same protected class—whose experiences were largely consistent with her own.

The jury may ultimately weigh this evidence and find in favor of PNC; but, the weight of this evidence is not within the purview of the Court when considering a motion for summary judgment. Accordingly, summary judgment in PNC's favor on Andrews' discrimination claim under Title VII claim is inappropriate.

## IV.     CONCLUSION

For the foregoing reasons, PNC's Motion for Summary Judgment will be granted-in-part and denied-in-part. An appropriate order follows.

BY THE COURT:

*/s/Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: October 6, 2022

cc: All counsel of record